**GENERAL SHIP
CORPORATION, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

Civ. A. No. 84–2114–Mc.

United States District Court,
D. Massachusetts.

May 12, 1986.

Patton, Boggs & Blow, Jeanne C. Trahan, and Judith Bartnoff, Robert H. Koehler, Washington, D.C., Thayer Fremont-Smith, Choate Hall & Stewart, Boston, Mass., for plaintiff.

Martha Sosman, Asst. U.S. Atty., for defendant.

## MEMORANDUM AND ORDER

McNAUGHT, District Judge.

In this action seeking an equitable adjustment in the price of a contract between the United States and General Ship Corporation for the overhaul of a Navy vessel, the defendant has moved for summary judgment, Document 14, and the plaintiff has moved for partial summary judgment, Document 8. The parties have submitted joint statements of facts, affidavits and supporting memoranda.

In 1980, the Navy awarded the plaintiff General Ship Corporation ("GSC") a Master Contract for Repair and Alteration of Vessels and the job order for the regular overhaul of the vessel U.S.S. GARCIA. As part of the job order, Work Item 251–01 called for the removal, disassembly, cleaning, inspection, testing, repair, reassembly and reinstallation of the U.S.S. GARCIA's two superchargers. It also required that GSC subcontract with the Elliott Company ("Elliott"), the manufacturer of the superchargers, to do all the cleaning, repair and reassembly work on the superchargers at Elliott's New Jersey facilities and to provide technical assistance for the removal, reinstallation and checkout of the superchargers.

GSC negotiated and obtained a subcontract proposal to perform the work on the superchargers specified in the work item from Elliott. GSC accepted the proposal and entered into a contract with Elliott, embodied in Purchase Order No. 19321 ("1st Elliott Purchase Order"). Paragraph 7 of the 1st Elliott Purchase Order provided in pertinent part that Elliott would "be responsible for rework to correct work rejected and defects occurring during the guarantee period" and would, "in concert with" GSC, be responsible for presenting completed work to the customer for acceptance." GSC and Elliott entered into a separate subcontract, Purchase Order No. 19063A ("2nd Elliott Purchase Order"), in which Elliott was to provide GSC with a service engineer or technical representative

for technical assistance. The United States was not a party to either contract.

GSC removed, packed and shipped the superchargers to Tickle Engineering Services ("Tickle"), a subcontractor designated by Elliott as the repair facility where the cleaning, repair and reassembly of superchargers was done. As required by the 1st Elliott Purchase Order and the work item, Elliott sent GSC reports on the progress of the work, which GSC then sent to the Navy as "Condition Reports" signed by GSC personnel. When Elliott's subcontract work was completed, the Navy inspected the superchargers before they were shipped back to GSC. In the course of reinstalling and adjusting them, GSC discovered metal filings in the oil sump of one of the superchargers. In its complaint, GSC alleges that the problem was corrected by cleaning the supercharger sump, but only at considerable cost and delay. GSC also claims that the first technical representative provided by Elliott was incompetent, resulting in three weeks of wasted effort. After GSC finally complained to Elliott, Elliott sent another technical representative who completed the job within two days.

As a result of these unanticipated costs, GSC submitted a claim for equitable adjustment to the Government for Elliott's breach of its subcontracts. The contracting officer denied the claim. GSC then filed this action in the United States Claims Court. On June 27, 1984, it was transferred to this Court.

The gist of the Government's argument is that GSC's remedies for any alleged breaches of its subcontracts with Elliott lie against Elliott, not against the United States, which was not even a party to those subcontracts. Prime contractors alone are responsible for the work of the subcontractors. *See, e.g., Olson Plumbing & Heating Co. v. United States,* 602 F.2d 950, 957, 221 Ct.Cl. 197 (1979). Designating a particular subcontractor in the contract between the customer and the prime contractor does not, as GSC suggests, shift the entire risk of the subcontractor's non-performance, defective performance, or untimely perform-

ance to the ultimate customer. The prime contractor bids on and enters the contract, knowing and accepting the designation of the subcontractor. In its subcontract it provides whatever measure of protection it thinks it needs.

Specifically in defense contracts, the Armed Services Board of Contract Appeals has consistently held that the prime contractor is responsible for the work of the subcontractor, no matter who designates it. *See Aerokits, Inc.,* ASBCA No. 12324, 69–BCA ¶ 6, 917 (1968). The designation of a sole source subcontractor carries no government warranty with respect to the subcontractor's performance. *See, e.g., Cascade Electric Co.,* ASBCA No. 28674, 84–1 BCA ¶ 17,210 (1984); *DeLaval Turbine, Inc.,* ASBCA No. 21797, 78–2 BCA ¶ 13,521 (1978); *Therm-Air Manufacturing Co.,* ASBCA No. 15842, 74–2 BCA ¶ 10,818 (1974); *Environmental Tectonics Corp.* ASBCA No. 21657, 79–1 BCA ¶ 13,-796 (1979); *Datametrics, Inc.,* ASBCA No. 16086, 74–2, BCA ¶ 10,742 (1974); *Scale Electronics Development, Inc.,* ASBCA No. 21725, 77–2 BCA ¶ 12,615 (1977); *Federal Electric Corp.,* ASBCA No. 12449, 69–2 BCA ¶ 7,796 (1969); *Mast Distributors, Inc.,* ASBCA No. 24678, 82–1, BCA ¶ 15,727 (1982); *N.S. Meyer, Inc.,* ASBCA No. 27144, 83–1 BCA ¶ 16,214 (1982); *Pastushin Aviation Co.,* ASBCA Nos. 21243 and 22960, 82–1 BCA ¶ 15,639 (1982); *Norit Construction,* ASBCA No. 20584, 76–1 BCA ¶ 11,890 (1976); *Tri-State Construction Co.,* ASBCA No. 23982, 81–1 BCA ¶ 15,068 (1981); *Federal Electric Corp.,* ASBCA No. 20490, 76–2 BCA ¶ 12,035 (1976); *Fuller-American,* ASBCA No. 19629, 75–2 BCA ¶ 11,438 (1975).

Where a particular subcontractor is designated for the manufacture of a component, some Board and Claims Court decisions have indicated that the sole source designation implies a limited warranty that the designated manufacturer is capable of manufacturing the part in question. *See Interstate Coatings, Inc. v. United States,* 7 Cl.Ct. 259, 261 (1985); *Franklin E. Penny Co.,* 524 F.2d 668, 674–75 (Cl.Ct.1975);

*Cascade Electric Co., supra; DeLaval Turbine, supra; Environmental Tectonics, supra.* Such a limited warranty does not include a guarantee that the manufacturer will in fact perform properly on any given contract. *Environmental Tectronics Corp., supra.* ("The Government's warranty of a particular specified component does not extend to improper manufacture of that component. In such event the contractor can and should take its recourse against the supplier for furnishing an improper item.")

As the Government points out, this case does not involve a supply contract for a component but rather a subcontract for repair services. No Board decision to date has found even any limited warranty of ability in designated service subcontracts. *See Fuller-American,* ASBCA No. 19629, 75-2 BCA ¶ 11,438 (1975). Even assuming that the limited warranty would be applicable to a designated service subcontractor, the Government has not breached any such warranty here because Elliott, as the manufacturer of the superchargers, was capable of performing the work.

The Government is correct in contending that there are no equitable considerations justifying a shift in responsibility for Elliott's alleged inadequate performance from GSC to the Navy. The Navy did not prevent GSC from supervising or controlling Elliott's work. What in fact should be emphasized is that the master contract required GSC, as contractor, to supervise the work of its subcontractors. The Navy did not "accept" the superchargers or Elliott's work on them by simply inspecting them. *See* Military Specification, MIL-I-45208A, § 3.11 ("Government inspection shall not constitute acceptance; nor shall it in any way replace contractor inspection or otherwise relieve the contractor of his responsibility to furnish an acceptable end item.")

The plaintiff bases its theory on those cases where the Government designated the sources for supplies to be used and thus is liable to the contractor for any additional costs and delays generated by inadequate performance. Its argument hangs on the critical assumption that the Government, by making mandatory the designation of a subcontractor, makes certain warranties as to that subcontractor's performance which entitle the general contractor to an equitable price adjustment under the Government contract if the subcontractor breaches its contract. This assumes too much. This Court will not hold the Government liable for a breach of a contract to which it was not a party. If Elliott breached the contract, GSC should sue Elliott, especially since GSC's own contract with Elliott provides that "the seller [Elliott] will be responsible for rework to correct work rejected and defects occurring during the guarantee period." 1st Purchase Order, ¶ 7.

Accordingly, the defendant's motion for summary judgment is hereby granted and the plaintiff's motion is denied.